UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

v.

JOSEPH A. KOSTELECKY,

        Defendant.

**COMPLAINT**

C.A. No. _____

Plaintiff, Securities and Exchange Commission ("Commission"), brings this civil action against the above-named defendant and states:

## I.    SUMMARY OF ACTION

1. This matter concerns defendant Joseph A. Kostelecky's participation in a financial fraud that occurred at Poseidon Concepts Corp., a now-defunct Canadian oil and gas services company, which conducted business in the U.S. through its wholly-owned subsidiary Poseidon Concepts Inc., a Delaware corporation (collectively "Poseidon").

2. Between January and November 2012 (the "Relevant Period"), Poseidon issued three quarterly financial statements with materially inflated revenues while its stock was trading in the U.S.

3. In conjunction with others, Kostelecky knowingly or recklessly engaged in conduct that resulted in Poseidon recording approximately $100 million of improper revenues based on non-existent and/or uncollectible take-or-pay contracts.

4. Kostelecky's misconduct included knowingly or recklessly directing Poseidon's U.S. accounting staff to record revenues for the take-or-pay contracts without supporting documentation and then subsequently making false assurances to certain members of Poseidon's management in Canada regarding the existence of valid and collectible contracts with U.S. customers.

5. The magnitude of the overstatements was substantial, comprising approximately 64% to 72% of total revenues reported over the Relevant Period

## II.    JURISDICTION AND VENUE

6. The Commission brings this action pursuant to the authority conferred upon it by Sections 21(d), 21(e), and 21A(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e) and 78u-1(a)].

7. This Court has jurisdiction over this action pursuant to Sections 21(e), 21A(a), and 27 of the Exchange Act [15 U.S.C. §§ 78u(e), 78u-1(a), and 78aa].  Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged herein.

8. Venue lies in this Court pursuant to Sections 27 and 21A(d)(4) of the Exchange Act [15 U.S.C. §§ 78aa and 78u-1(d)(4)] because certain of the acts, transactions, practices, and courses of business constituting the violations of law alleged herein occurred within the District of North Dakota.  Moreover, defendant Kostelecky resides in this District.

## III.    DEFENDANT AND RELEVANT ENTITY

9. **Joseph A. Kostelecky**, age 53, is a resident of Dickinson, North Dakota.  During the Relevant Period, Kostelecky was a senior vice president of Poseidon until approximately

May 9, 2012, following which he held the title of executive vice president until his resignation on December 14, 2012. During the Relevant Period, Kostelecky was in charge of sales and operations for Poseidon in the U.S. (supervising approximately 40 employees). Kostelecky was Poseidon's only executive officer in the U.S.

10. **Poseidon Concepts Corp.**, is a Canadian company headquartered in Calgary, Canada, which had, during the Relevant Period, a wholly-owned U.S. subsidiary with offices in Denver, Colorado, and Dickinson, North Dakota. Poseidon Concept Corp.'s common stock is quoted in the U.S. on OTC Link (symbol "POOSF"), which is operated by OTC Markets Group Inc. During the Relevant Period, Poseidon filed periodic reports containing its financial statements with the Alberta Securities Commission via SEDAR and also published the financial statements on its website. Poseidon filed for Chapter 7 bankruptcy protection on April 12, 2013. The assets associated with Poseidon's U.S. operations were sold in June 2013 and Poseidon no longer conducts business in the U.S.

## IV.    SUMMARY OF VIOLATIONS

11. Through the activities alleged in this Complaint, defendant Kostelecky, directly or indirectly, engaged in transactions, acts, practices, and courses of business that aided and abetted Poseidon's violations of Exchange Act Section 10(b) [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. §§ 240.10b-5] thereunder.

## V.    FACTS

**A.    Background**

12. Poseidon's U.S. business was focused on the rental of above-ground fluid storage tanks for oil and gas hydraulic fracturing operations.

13.     As part of its tank rental business, Poseidon generated revenues from two types of arrangements with its customers, day-to-day (or live tank) rentals and take-or-pay contracts.

14.     Take-or-pay arrangements predominated in the U.S.  Under this type of arrangement, Poseidon provided the customer with guaranteed access to a set number of tanks charged at a specified (generally discounted) rate for a certain period.  In the take-or-pay scenario, customers were obligated to pay Poseidon whether or not they took delivery of or used the tanks.

15.     By contrast, day-to-day rentals were based solely on the actual usage of the tanks at field drilling sites.

16.     Poseidon's U.S. customers negotiated these revenue arrangements with Poseidon's business development staff located in the U.S., which was under the direct supervision and direction of Kostelecky.  In addition to his supervisory role, Kostelecky also carried out a senior sales role, and he personally negotiated a substantial number of purported take-or-pay arrangements with U.S.-based customers.

17.     Formalized take-or-pay arrangements were, pursuant to Poseidon's policies and procedures, required to be scanned and placed in customer files located on Poseidon's shared computer server (also known as the "P-drive").  Kostelecky knew of this policy.  Both Kostelecky and the U.S. accounting staff had access to the customer files on the P-drive.

18.     However, notwithstanding Kostelecky's frequent direct involvement, documentation of the arrangements with U.S. customers was often not formalized.  In such instances, Kostelecky gave explicit directions to certain members of the U.S. accounting staff regarding what revenues to record with respect to the take-or-pay arrangements for at least the first two quarters of 2012.  Kostelecky is not an accountant.

19. After approximately June 2012, when Poseidon hired an operations controller located in Canada (the "Operations Controller"), Kostelecky provided assurances to certain members of the U.S. and Canadian accounting staff regarding the existence and collectability of the take-or-pay arrangements, which continued to yield additional purported revenues in the third quarter of 2012.

20. During 2012, Poseidon issued and published three sets of quarterly financial statements.

   a. On May 9, 2012 Poseidon issued its unaudited interim condensed consolidated financial statements for the three-months ended March 31, 2012 ("Q1 2012"), reporting revenues of $52,129,000. Of the Q1 2012 revenues, approximately 80% were generated in the U.S., and the remaining 20% in Canada. Q1 2012 revenues represented a 460% increase over the same period in the previous year. The accounts receivable balance as of March 31, 2012, was $83,018,000.

   b. On August 8, 2012, Poseidon issued its unaudited interim condensed consolidated financial statements for the three and six months ended June 30, 2012 ("Q2 2012"), reporting revenues of $54,875,000 for Q2 2012 and $107,004,000 for the first six months of 2012. Of the Q2 2012 revenues, approximately 94% were generated in the U.S. and 6% in Canada. Q2 2012 revenues represented a 568% increase over the same period in the previous year and the six-month period revenues represented a 510% increase over the first six months of 2011. The accounts receivable balance as of June 30, 2012, was $118,641,000.

   c. On November 14, 2012, Poseidon issued its unaudited interim condensed consolidated financial statements for the three and nine months ended September

30, 2012 ("Q3 2012"), reporting revenues of $41,116,000 for Q3 2012 and $148,120,000 for the first nine months of 2012. Approximately 84% of the Q3 2012 revenues were generated in the U.S. and 16% in Canada. Q3 2012 revenues represented a 171% increase over the same period in the previous year and the nine-month period revenues represented a 329% increase over the first nine months of 2011. The accounts receivable balance as of September 30, 2012, was $125,516,000.

**B.     Poseidon Materially Inflated Its Revenues During the Relevant Period**

21.     During the Relevant Period, Kostelecky either directly negotiated and/or approved all of the purported take-or-pay arrangements with Poseidon's U.S. customers. As such, Kostelecky knew, or was reckless in not knowing, if any of the purported take-or-pay contracts were never consummated or were otherwise uncollectible.

22.     For Q1 and Q2 2012, Kostelecky was put in a position to and he did direct a newly-hired, inexperienced, entry-level accounting staff member in Denver (the "Invoicing Clerk") to book and invoice take-or-pay contracts with U.S. customers.

23.     There was no basis, however, to book a material amount of the revenues from these contracts because the purported take-or-pay contracts simply did not exist or were otherwise uncollectible.

24.     The recording of these revenues also violated Poseidon's revenue recognition policy, which required persuasive evidence of an arrangement and reasonable assurance of collectability. Kostelecky knew, or was reckless in not knowing, this policy as it was published in Poseidon's 2011 annual report in March 2012.

25.     The Invoicing Clerk asked Kostelecky for written documentation, such as signed contracts, to support the revenues she was asked to record.

26.     In response, Kostelecky told her, falsely, that the documents existed (either on his computer or in another location), but they were never provided to her or placed on the P-drive.

27.     After Kostelecky chastised the Invoicing Clerk several times for not following his directives and for waiting on written documentation, she relented and booked the revenues.

28.     However, contemporaneously, the Invoicing Clerk also began to maintain a list of the take-or-pay contracts booked at Kostelecky's direction (the "Contract List").  By early August 2012, the Invoicing Clerk had added notations to the Contract List about which take-or-pay contracts lacked supporting documentation on the P-drive.

29.     Kostelecky also repeatedly provided false assurances to certain senior accounting managers of Poseidon in Canada regarding the existence and collectability of the take-or-pay contracts with U.S. customers.

30.     For example, on July 27, 2012, in connection with the preparation of the Q2 2012 financials, Poseidon's chief financial officer ("CFO") e-mailed Kostelecky to confirm the validity of the revenues, stating: "[Q2 2012] numbers [are] also really helped by all the contracted [take-or-pay] revenue . . . which obviously flows straight to the bottom line given the limited associated costs . . . hence why I want to ensure this contract revenue is all good, safe, unlikely to be disputed, etc."

31.     In response, Kostelecky represented falsely that Poseidon had valid, existing, and collectible take-or-pay contracts to back up the Q2 2012 revenues.

32.     In Q3 2012, Poseidon's recently-hired Operations Controller began to question seriously whether the take-or-pay receivables were collectible and he sought information from

both the accounting staff in Denver and from Kostelecky regarding the underlying contracts and the reasons for the increasingly large and aged receivables.

33.     For example, on August 15, 2012, the Operations Controller wrote an e-mail to the U.S. accounting staff observing that, for one large U.S. customer, he was highly skeptical and it seemed "fishy" that the customer would agree to pay $877,000 per month just for the right to use the tanks (but not actually use them).

34.     After finding other examples raising revenue recognition concerns, in an e-mail dated August 24, 2012, the Operations Controller posed the following direct question to Kostelecky: "The crux of the matter Joe, is do we have customer signed contracts . . . to validate what we are billing on these contracts?"

35.     Kostelecky falsely responded that, "[t]here are only 3 [customers] all of which are small that do NOT have a signed contract!!"

36.     Three days later, on August 27, 2012, in response to the Operations Controller's inquires about the status of Poseidon's supporting documentation for the take-or-pay contracts, the Invoicing Clerk shared with him the Contract List.  Specifically, she wrote: "The contract list was started in April and I was told what we have contracts for.  I have a lot of lease term sheets but as you can see many aren't signed.  I was told [by Kostelecky] this didn't matter, but as you can see it's definitely starting to."

37.     In fact, the Contract List (to which Kostelecky had access) showed that only 12 of the 54 listed take-or-pay contracts had fully executed copies on the P-drive.

38.     Concerned, the Operations Controller pressed Kostelecky for the supporting contract documentation and for answers regarding the large take-or-pay receivables.

39. The Operations Controller also took the additional step of circumventing Kostelecky and contacting some of Poseidon's customers directly. On August 30, 2012, he reported to the CFO via email: "Lots of calls being made, lots of blank stairs [sic], and head scratching from our customers end. . . . In a lot of cases I have been talking to customers who we have millions of dollars in receivable balances who have no idea who Poseidon is. . . . I have **absolutely no confidence that we will be paid any of the [take-or-pay] contract revenue that we have entered, (likely in the 60 million dollar range)**." (emphasis added).

40. In response to the Operations Controller's inquires to Kostelecky and others, in multiple meetings with Poseidon's senior executives and the Operations Controller during September and October 2012, Kostelecky continued to claim that the take-or-pay contracts existed, blamed others for invoicing errors, and made assurances as to the collectability of the purported U.S. take-or-pay contracts.

41. As a result, Poseidon issued its 3Q 2012 financial statements on November 14, 2012, without adequate adjustments for the inflated take-or-pay revenues and receivables.

**C.     The Fraud at Poseidon is Exposed**

42. Less than a week after the Q3 2012 financial statements were published, an independent member of Poseidon's board of directors learned that the Operations Controller believed that at least $70 million of the company's take-or-pay receivables were uncollectable.

43. A special committee of the board of directors (the "Special Committee") was formed to conduct an internal investigation into the collectability of Poseidon's receivables.

44. As part that internal investigation, the Special Committee retained Ernst &Young ("E&Y") in Calgary to perform a forensic review of Poseidon's accounts receivable. E&Y provided a preliminary report to the Special Committee in February 2013.

45.   On the basis of that report, on February 14, 2013, Poseidon issued a press release advising that the board of directors had preliminarily determined that primarily related to long term take-or-pay arrangements:

  a. "Approximately $95 million to $106 million . . . of the [c]ompany's $148.1 million in revenue [or 64% to 72%] for the 9 months ended September 30, 2012 should not have been recorded as revenue in the [c]ompany's financial statements";

  b. "[A]pproximately $94 million to $102 million . . . of the [c]ompany's $125.5 million accounts receivable as at September 30, 3012 should not have been recorded in the Company's financial statements as accounts receivable"; and

  c. "As a result of the foregoing, the first, second and third quarter 2012 financial statements . . . will be restated and the [c]ompany advises investors that they should no longer rely on the [f]inancial [s]tatements as well as the corresponding Management's Discussion & Analysis."

46.   Between November 14, 2012, and February 15, 2013, as the inflated revenues were exposed, Poseidon's common stock lost 98.6% of its value (falling from $13.10/share to $.18/share).

## VI.   CLAIM FOR RELIEF
(Aiding and Abetting Fraud)
Section 10(b) of the Exchange Act and Rule 10b-5
[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

47.   Paragraphs 1 through 46 are hereby realleged and incorporated by reference.

48.   Poseidon, through the acts and omissions of its officers, directly or indirectly, with scienter, in connection with the purchase or sale of securities, by use of the means or

instrumentalities of interstate commerce or by use of the mails, employed devices, schemes, or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

49. Defendant Kostelecky aided and abetted Poseidon, in that he, with a general awareness of his role in the primary violations by Poseidon, provided substantial assistance to Poseidon in the commission of its violations of Section 10(b) of the Exchange Act and Rule 10b-5.

50. By reason of the foregoing, Kostelecky aided and abetted, and unless restrained and enjoined will in the future aid and abet, violations of Section 10(b) of the Exchange Act and Rule 10b-5.

## VII.    PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

1. Find that defendant Kostelecky committed the violations alleged.

2. Enter injunctive relief permanently restraining and enjoining defendant Kostelecky from, directly or indirectly, to the full extent provided by Rule 65(d) of the Federal Rules of Civil Procedure, violating the provisions of law and rules alleged in this Complaint.

3. Order defendant Kostelecky to pay civil money penalties pursuant to Section 21(d)(3)(iii) of the Exchange Act.

4. Order that defendant Kostelecky be permanently prohibited from acting as an officer or director of any public company.

5. Grant other relief as this Court may deem just or appropriate.

## VIII. JURY DEMAND

Plaintiff demands a jury trial in this matter.

Dated this 6th day of February, 2015.

                         Respectfully submitted,

                         /s/ Nicholas P. Heinke
                         Nicholas P. Heinke (heinken@sec.gov)
                         Attorney for the Plaintiff
                         Securities and Exchange Commission
                         Byron G. Rogers Federal Building
                         1961 Stout Street, Suite 1700
                         Denver, CO  80294-1961
                         Phone:  (303) 844-1000
                         Facsimile: (303) 297-1730

Of Counsel:
Ian S. Karpel (karpeli@sec.gov)
J. Lee Robinson (robinsonjl@sec.gov)